861 So.2d 862 (2003)
Melba Margaret Schwegmann BROWN
v.
John F. SCHWEGMANN and Melinda B. Schwegmann.
No. 2002-CA-1509.
Court of Appeal of Louisiana, Fourth Circuit.
December 10, 2003.
Rehearing Denied January 15, 2004.
*863 Randall A. Smith, L. Tiffany Hawkins Davis, Andrew Lewis Kramer, Smith & Fawer, L.L.C., New Orleans, LA, for Plaintiff/Appellant.
Richard H. Barker, IV, New Orleans, LA, for Defendant/Appellee.
(Court composed of Judge DENNIS R. BAGNERIS Sr., Judge EDWIN A. LOMBARD, Judge LEON A. CANNIZZARO Jr.).
EDWIN A. LOMBARD, Judge.
This appeal involves the alleged breach of fiduciary duties by John F. Schwegmann, trustee of the trust established for the sole benefit of his sister, Margaret Melba Schwegmann Brown. After consideration of the briefs, the applicable law, the record and the evidence contained therein, the judgment of the trial court is reversed and the matter is remanded for a hearing on the issue of damages.

Relevant Facts and Procedural History
In 1962, John G. Schwegmann established separate trusts for the benefit of his three children, Melba Margaret Schwegmann Brown ("the appellant"), her half-brother John F. Schwegmann ("the appellee"), and a third child not involved in this litigation, Guy Schwegmann. Initially, each trust corpus consisted of a cash gift to purchase shares of the senior Mr. Schwegmann's company, the Schwegmann Giant Supermarkets, Inc.
The trust at issue in this case, entitled "Trust for Melba Margaret Schwegmann," was executed on June 4, 1962, when Ms. Brown was five years old. In addition to the standard language stating that the trustees shall administer, receive, hold, manage and control the trust estate during the trust period, and use their judgment concerning any investments of trust assets, Paragraph VI provided:
The income realized from the property forming the subject of this Trust, or the income on property hereafter acquired and forming part of the corpus of the Trust Estate, shall be distributed to the beneficiary monthly at a rate to be determined by the Trustees according to the income of the trust and the needs of the beneficiary, and the balance of said income shall be accumulated and held in trust by the Trustees until the termination of this Trust, provided that at any time prior to the termination of the Trust the Trustees, in their sole discretion may pay or deliver to the beneficiary from the Trust property or from the income any money that may be necessary or desirable in the best interests, comfort, health or general welfare of the beneficiary.
The trust instrument initially provided for five (5) trustees[1] who were dispensed from giving security and who were authorized to purchase for the trust "an interest in the partnership Schwegmann Brothers Giant Super Markets and the common *864 and/or preferred stock of Schwegmann Brothers Giant Super Markets, Inc.", to borrow funds for the trust and execute promissory notes, bonds and other forms of indebtedness, and to pledge and mortgage the trust property. Accordingly, shortly after the inception of the trust, the original trustees invested the trust's asset into Schwegmann Giant Super Markets, Inc. (the Schwegmann corporation), acquiring 17 shares of stock. In addition, the trust corpus was supplemented over the years with additional cash gifts, real estate, and stock dividends.
The appellee became trustee of the appellant's trust and began signing trust transactions in 1971. Around 1979, due to his father's failing health, the appellee purchased the senior Mr. Schwegmann's interest in the family business, including Schwegmann Giant Super Markets (the Schwegmann partnership) and Schwegmann Giant Super Markets, Inc. (the Schwegmann corporation), and assumed control of the day-to-day operations of the Schwegmann family business as CEO and majority stockholder. Appellee remained as trustee of his sister's trust even after assuming control and majority ownership of the Schwegmann corporation in which appellant's trust was invested. Moreover, appellee's wife, Melinda Schwegmann, was appointed as trustee for the appellee in 1980 and due to death and aging of the original trustees, the appellee and his wife were the sole remaining trustees of Ms. Brown's trust by 1996.
Ms. Brown never received funds from or an accounting of her trust and, accordingly, after a formal demand letter requesting an accounting of her trust funds was ignored, Ms. Brown filed a lawsuit in 1999 against the trustees, seeking an order mandating that the trustees render an accounting. After being personally served in October 1999 with the lawsuit, the trustees agreed to provide an accounting and, as a result, no hearing was held regarding Ms. Brown's petition. The promised accounting was not forthcoming, however, and Ms. Brown filed the instant suit for removal of the trustees and for damages in March 2000. Six months later, the appellee placed the Schwegmann partnership in bankruptcy and, shortly thereafter, placed the Schwegmann corporation in bankruptcy. The appellee (as bankruptcy petitioner) failed to list his sister's trust as a creditor of the partnership in the bankruptcy proceedings and (as trustee) failed to file a proof of claim on behalf of the trust despite a request by appellee's attorney that he (as trustee) take the steps necessary to protect the trust's interests. Several days prior to the expiration of the time to file proof of claims in the bankruptcy, the appellee and his wife resigned as trustees of appellant's trust, thereby permitting the successor trustee to file a proof of claim and reserving all rights against the appellee and his co-trustee wife for damages resulting from their breach of trust.
At the bench trial in this matter, the plaintiff/appellant contended that both the appellee and his co-trustee wife breached their fiduciary duty as trustees by (1) failing to hold trust income in trust for the beneficiary; (2) failing to invest trust income for the benefit of the trust; and (3) diverting the trust funds to his own use in violation of the Louisiana Trust Code. The defendant/appellee contended, however, that he merely continued the original practices established by his father as settlor of the trust. The district court agreed and entered judgment in his favor. Ms. Brown now appeals that judgment.

Standard of Review
It is axiomatic that appellate courts may only disturb a trial court's findings of fact that are manifestly erroneous *865 or clearly wrong. However, an appellate court is not bound to accept a trial court's determination that is derived from overlooking an applicable legal principle. Mart v. Hill, 505 So.2d 1120, 1127 (La. 1987). Although the factual findings of the trial judge are accorded great weight, it is the duty of the reviewing court to determine if the fact finder's conclusions are justified and the reviewing court is not required to affirm the trial court's conclusion merely because some record evidence would furnish a reasonable factual basis for the contested findings. Id. Likewise, although the credibility determinations of the trial court are generally accorded great deference, where documents or objective evidence so contradict the witness's story or the story itself is so internally inconsistent or implausible on its face that a reasonable fact finder would not credit the witnesses story, the appellate court may find a trial court's finding which is purportedly based upon a credibility determination to be manifestly erroneous or clearly wrong. Rosell v. ESCO, 549 So.2d 840, 844-845 (La.1989).

Applicable Law
The Louisiana Trust Code, Revised Statutes Title 9, §§ 2081 et seq., establishes the duties of the trustee. La.Rev. Stat. § 9:2090, sets forth the following standard for administration of a trust:
A. A trustee shall administer the trust as a prudent person would administer it. In satisfying this standard, the trustee shall exercise reasonable care and skill, considering the purposes, terms, distribution requirements, and other circumstances of the trust.
B. A trustee who has special skills or expertise, or has held himself out as having special skills or expertise, has a duty to use those special skills or expertise.
The trustee must administer the trust "solely in the interest of the beneficiary," La.Rev.Stat. 9:2082, must "invest and manage trust property as a prudent investor," La.Rev.Stat. 9:2127, and, unless the trust instrument provides otherwise, is prohibited from lending funds to himself, to his employer, partner or other business associate. La. Rev. State. 9:2084. Moreover, a trustee has a duty to (1) "take reasonable steps to take, keep control of, and preserve the trust property," La.Rev.Stat. 9:2091; (2) defend actions that may result in a loss to the trust estate unless such defense is unreasonable under the circumstances, La.Rev.Stat. 9:2093; and (3) keep the trust property separate from his own individual property and separate from other, non-trust property. La.Rev.Stat. 9:2094. In addition to providing an annual accounting, see La.Rev.Stat. 9:2088, the trustee must furnish "complete and accurate information" whenever a beneficiary requests information regarding the trust. La.Rev.Stat. 9:2089.
Any violation of a duty owed to a beneficiary by the trustee is defined as a breach of trust. La.Rev.Stat. 9:2081. The liability of a trustee who commits a breach of trust is set forth in La.Rev.Stat. 9:2201, which provides:
If a trustee commits a breach of trust he shall be chargeable with:
(1) A loss or depreciation in value of the trust estate resulting from a breach of trust; or
(2) A profit made by him through breach of trust; or
(3) A profit that would have accrued to the trust estate if there had been no breach of trust.
*866 Where a trust has co-trustees[2], "each shall participate in the administration of the trust and use reasonable care to prevent a co-trustee from committing a breach of trust and shall compel him to redress a breach of trust." La.Rev.Stat. 9:2096.

Discussion
The following evidence was adduced at trial. Pedalhore Company, the certified public accounting firm used by the Schwegmann companies and individuals, prepared the trust instrument. The appellee owns approximately 82% of the Schwegmann corporation; appellant's trust owns approximately 3% of the Schwegmann corporation;[3] and the remaining shares of the Schwegmann corporation belong to the appellee's trust and the trust of Guy G. Schwegmann, the brother of the appellee and appellant. In turn, the Schwegmann corporation owns 83.33% of the Schwegmann partnership that controlled the day-to-day business activities of the Schwegmann stores.
A separate bank account was never established for the trust. Rather, the trust funds remained in the Schwegmann partnership bank account with notations in the partnership accounting records as money owed to the trust. In addition, financial transactions such as real estate purchases and sales made by the partnership were reflected in the accounting books as money owed by the partnership to the trust.
In 1986, the Schwegmann corporation began declaring dividends. Based on the 17 shares of stock owned, Ms. Brown's trust earned a dividend of $30,940 in the first year. The dividend check for that amount was issued by the Schwegmann partnership, deposited in the partnership checking account, and credited to the trust, i.e. the check was written for tax purposes with the money never leaving the company or going into the bank account for the trust. During the period between 1986 and 1996, all of the dividends due to Ms. Brown's trust were handled in the same manner wherein a dividend check was issued by the partnership to the trust, but the money never actually left the partnership account for deposit into a separate trust account. The trust account and tax returns filed by the trust indicate the total dividends paid to the trust from 1986 to 1996 totaled $259,318.00, in addition to approximately $246,000.00 in interest.[4]
*867 The appellee, as majority owner and Chief Executive Officer ("CEO") of the Schwegmann companies since 1979 who determined the fiscal policies and controlled the day-to-day business activities was well aware of the fiscal health of the family business while serving as trustee for both his own trust and that of his sister. Notably, whereas dividend money due to his sister's trust never left the partnership account, dividend money due to appellee's trust was given directly to the appellee through the deposit of checks written by the partnership into appellee's personal drawing account.
By contrast, the appellant was not involved in the day-to-day operations of the family business and did not have check-writing authority with the partnership although it was the partnership rather than Ms. Brown who received the funds that were owed to her trust. Moreover, the appellant never received an accounting from her brother/trustee, which would have informed her of the status and balance of her trust, even when she formally requested such an accounting.
Moreover, because appellee's trust owned almost four times as many shares, it received almost four times as much in dividends and, accordingly, during the ten-year period, appellee's trust earned approximately a million dollars in dividends. Accordingly, during the period from 1986 to 1996, when appellee was trustee of both his own and appellant's trust, $250,000 in dividends earned by Ms. Brown's trust went back into the Schwegmann companies which appellee controlled as CEO and majority stockholder, while the million dollars in dividends earned by his trust went into his drawing account for his use. As a result of the appellant's trust funds not being put into a separate account or invested for the sole benefit of the trust, as of March 1, 1997, there was a debit owed to Ms. Brown's trust by the Schwegmann partnership of $551,440.86. This debt owed to appellant's trust by the Schwegmann partnership was not secured in any way and the partnership is now in bankruptcy.
During the period from 1979 until 1997, the appellee instructed the company accountant as to the handling of Ms. Brown's trust, the partnership and corporate accounts, as well as his own trust and personal accounts. According to the testimony of appellee's accountant and appellee's financial statements submitted into evidence, in 1991 when approximately $367,000.00 was owed to Ms. Brown's trust from the partnership, appellee spent $357,000.00 on his own personal expenses from the partnership drawing account. In 1992 and 1993, while the partnership owed to Ms. Brown's trust approximately $462,000 dollars at the end of 1992 and approximately $491,900.00 at the end of 1993, appellee made gifts totaling approximately $461.000.00 to his children's trust which were charged to the partnership. Likewise, as of December 31, 1995, when appellee was over $11 million dollars in debt to the partnership in accounts and notes payable, the partnership owed Ms. Brown's trust $539,000.00. Accordingly, it appears that while funneling money intended for Ms. Brown's trust account back into the company coffers, the appellee used $11 million dollars of company money to build his own house, (approximately $2 million), to build a beach house, to start the Schwegmann Bank, to invest in a Checkers franchise, to fund his wife Melinda's 1991 and 1995 political campaigns, to give gifts to his children's trust, to make various personal investments, and for other, nonspecific, personal uses.
*868 In 1997, the partnership was sold for $70 million dollars to SGSM Acquisition Co. L.L.C. (the Kohlberg Company), but none of the money from the sale was used to repay Ms. Brown's trust, which was owed over $500,000.00 at that time. Kohlberg filed for bankruptcy relief in 1999 and as a result of the Kohlberg bankruptcy, the partnership became insolvent. Nonetheless, between September 1999 and September 2000, appellee, his wife Melinda, and their children received an additional $243,000.00 from the partnership.[5]
At trial, the appellee claimed that his practice of leaving his sister's trust funds in the company was to benefit all the stockholders but that, as majority stockholder, his withdrawal of large sums of money from the company account to fund his children's trust, his wife's political campaigns, renovation of his house, and a separate business, was only a matter of using his own money for his own uses. The appellee explained:
I took out of the company what I thought that I was, first of all, in good conscious [sic] in doing, protected the company, which I didn't have to do. For example, when I borrowed money to improve my home there was no one that dictated to me or made me even give the company a mortgage, okay, on that. So I think that there is [sic] loads of evidence, that even though I may have worn separate hats, that I tried to do always the responsible thing by the company and also, you know, treated myself in a fashion that I was comfortable with. And I think [I] treated my sister in a royal fashion as well.
The appellee conceded he was aware in 1996 that the partnership owed his sister's trust approximately $500,000.00 and that the partnership was in financial trouble, but that he took no actions as trustee to protect the assets of the trust.

Analysis
The district court failed to apply correctly the law governing a trustee's fiduciary obligations to the trust beneficiary. The facts unquestionably demonstrate that the appellee failed to properly administer the trust for the best interest of the beneficiary as required by La.Rev.Stat. 9:2082 and, as such, he is personally liable for his breach of trust.
Specifically, the appellee allowed his sister's trust funds to be diverted for personal use by another: himself.[6]See La. Rev.Stat. 9:2084 (prohibiting trustee from lending trust funds to himself). The appellee, as trustee, allowed trust funds to be "loaned" from the trust to the Schwegmann partnership and these "loaned" funds ended up in appellee's own pocket for his personal use through his ability to write checks without scrutiny or limitation from the drawing account of the partnership.
The appellee failed to invest trust funds on behalf of the beneficiary even though the La Rev. Stat. 9:2082 requires that the trustee act solely in the interest of the beneficiary and invest trust funds as a prudent administer. See La.Rev.Stat. 9:2082 (requiring trustee to invest and *869 manage trust property as a prudent investor). Although investing solely in the family business may have been wise during the senior Schwegmann's prosperous administration of the business, as the business declined in financial strength such a plan ceased being prudent management of trust funds. Clearly, after the partnership began declining in value in 1996, investing the trust property solely in the family business was not prudentparticularly by a trustee with appellee's specialized knowledge of financial health of the Schwegmann companiesor designed to protect and preserve the trust property in the interest of the beneficiary. Moreover, while continuing to divert the trust funds into a failing enterprise, the appellee failed to provide the required annual accounting to the beneficiary and once bankruptcy was declared for the partnership, despite the substantial sum owed the trust by the partnership according to the partnership accounts, the appellee failed to list the trust as a creditor or take any steps as trustee to protect the trust assets.
The appellee's contention that he managed the trust funds in the manner his father prescribed for the trusts is seriously flawed. First, when the settlor established the trusts and created the idea of having the trust funds placed back into the partnership, it was with the idea that the family grocery business would prosper and the interests, or shares, of the partnership belonging to the trusts would therefore increase in value as well. Second, during the time when the settlor was operating the family grocery business and using the trust funds to assist in that endeavor, the money earned by the partnership was not being drained of its funds for the personal uses of the CEO. These circumstances changed when appellee began running the business and the management of the trust at issue should have changed as well.
Dividends began to be paid in 1986, long after the elder Schwegmann ceased to be involved in the management of the business or the trust. Contrary to appellee's contention that he continued his father's practice of placing trust funds into the business for its use because it would inure to the benefit of all shareholders, the appellee began drawing out his own dividends from the company. His trust dividends were deposited into the partnership account to which only he had access. He enjoyed access to the funds from his own trust, while failing to distribute the dividends to his sister from her trust, despite the clear mandate in the trust instrument to distribute monthly.
Additionally, and even more significantly, the appellee drew out funds from the partnership by withdrawing millions of dollars from the partnership in the form of loans while the partnership owed substantial sums to the trust. In effect, the appellee was using his sister's trust funds for his own personal benefit. This type of self-dealing by trustees in the form of loans is absolutely prohibited La.Rev. Stat. 9:2084.
Moreover, the accounting documents for the trust and the financial statement of the trustee indicate that there were several occasions during the period from 1986-1997 (when the dividends were being paid at various times) when the money due the trust fund from the partnership account could have been returned to the trust or distributed to the trust beneficiary but, rather than doing so, the appellee chose to use the money for his and his own family's benefit and established trusts for his own children out of the partnership funds in the same amount owed to his sister's trust.
Additionally, the appellee failed to segregate and protect the trust funds as required by law. He failed to establish a separate bank account for the dividends as *870 they were paid to the trust; rather, he allowed, even directed, the trust dividend checks to be deposited into the partnership bank account only to be drawn out by him at a later date. This accounting practice is an express failure to safeguard trust funds by segregating them from other monies. The appellee also failed to protect the trust funds by allowing the money to be "loaned" to the partnership with no security or collateral to protect the funds for the trust.
Because the appellant never received an accounting, in violation of La.Rev.Stat. 9:2088, she had no knowledge of this misuse of her trust funds. Moreover, because she was not involved in the day-to-day business operations or have check-writing authority on the company accounts, the appellant did not have constructive knowledge of the financial dealings of her brother.
In sum, the appellee committed a serious breach of trust by failing to properly administer, segregate, and protect trust funds; by failing to account annually to the trust beneficiary which would have put the appellee on notice; by making loans to himself through the business; and by failing to distribute the trust funds to Ms. Brown when he learned that the partnership was in financial trouble. Accordingly, the appellee is personally liable for the losses sustained by his sister's trust and damages should be awarded. Because additional financial and investment information is necessary to determine the proper amount of damages, the matter is remanded to the trial court for a hearing on damages consistent with this finding that appellee is liable for breach of his fiduciary duties as trustee for his sister's trust.
Even though appellee's wife, Melinda Schwegmann, was the co-trustee of the trust, the evidence indicates that she was not aware of that position or, even if she were aware, she had no involvement with the trust management or the management of the family business. Applying the pertinent codal provisions for imposition of liability as to co-trustees, the record does not show that Mrs. Schwegmann participated in the breach of trust committed by her husband (although she certainly benefited financially from his breach); she did not delegate administration functions improperly to appellee; she did not conceal, approve, or acquiesce in the breach of trust; she did not enable the appellee to commit a breach of trust by her failure to exercise reasonable care in the administration of the trust; and she did not neglect to take the proper steps to compel the appellee to redress a breach of trust.
Although technically a co-trustee, we find that Mrs. Schwegmann did not participate in the business dealings with the partnership or the trust sufficiently to impose liability on her as a co-trustee. Accordingly, we conclude that on the record before us, Melinda Schwegmann is not liable as a co-trustee.

Conclusion
For the foregoing reasons, we find that John F. Schwegmann is liable to appellant for his breach of trust as trustee of the trust established for her by their father in 1962. Accordingly, we remand the matter for a hearing on the issue of damages to be assessed against him as his personal liability for breaching his fiduciary obligations as trustee for his sister's trust. John F. Schwegmann is cast with all costs of this appeal.
REVERSED AND REMANDED.
NOTES
[1] The initial trustees were Wilfred I. Meyer, Paul Schwegmann, Ernest Barrios, Anthony Schwegmann, and O'Neil Barrios.
[2] Liability of a co-trustee is set forth in La. R.S. 9:2205, which provides as follows:

A trustee shall not be liable to a beneficiary for a breach of trust committed by a co-trustee, unless he:
(1) Participates in a breach of trust committed by his co-trustee;
(1) Delegates improperly the administration of the trust to his co-trustee;
(1) Conceals, approves, or acquiesces in a breach of trust committed by his co-trustee;
(1) Enables his co-trustee to commit a breach of trust by his failure to exercise reasonable care in the administration of the trust; or
(1) Neglects to take proper steps to compel his co-trustee to redress a breach of trust.
[3] The shareholders, the shares, and percentages are as follows:

John F. Schwegmann453 shares82.21% voting power
Trust of Melba Margaret Schwegmann Brown17 shares3.09% voting power
Trust of John F. Schwegmann65 shares 11.80 % voting power
Trust of Guy G. Schwegmann16 shares 2.90 % voting power
Treasury Stock49 shares____ voting power
[4] Ms. Brown's trust reflects the following year-end credit balances: 12/26/86 $280,499.96; 12/27/87$308,233.67; 12/01/88$331,631.90; 1/01/90 $321,431.90; 1/01/91$376,183.90; 1/31/92$422,575.90; 1/03/93$478,114.04; 1/31/94$508,738.04; 1/29/95$524,883.04; 1/31/96$593,518.04; 1/01/97539,184.86. On March 1, 1997, the positive credit balance in the trust, as reflected on the accounting document, was $551,440.86.
[5] Moreover, between 1997 and 2000, John F. authorized the Partnership to loan him and Melinda around $1.3 million in unsecured funds.
[6] Similar to the facts in this case, in Matter of Donald E. Bradford Trust, 538 So.2d 263 (La. 1989), the settlor (Bradford) established a trust for his children in 1971. The Louisiana Supreme Court found the trustee liable for permitting a substantial amount of money to leave the trust to be used by the settlor for his own purposes because it was a clear breach of duty of the trustee's duty to the beneficiaries of the trust.